ELECTRONICALLY FILED
2022 Apr 05 PM 2:19
CLERK OF THE WYANDOTTE COUNTY DISTRICT COURT
CASE NUMBER: 2022-CV-000213

### IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
### CIVIL COURT DEPARTMENT

| | |
|---|---|
| CHAUNCEY MONROE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: |
| v. ) | Division No.: |
| ) | Chapter No.: 60 |
| PROPAK LOGISTICS, INC., ) | |
| ) | **REQUEST FOR JURY TRIAL** |
| Defendant. ) | |

## PETITION PURSUANT TO K.S.A. CHAPTER 60

COMES NOW Plaintiff, Chauncey Monroe, and for Petition for Damages against the above-named Defendant, alleges and states as follows:

1. Plaintiff is a resident of Missouri.

2. Defendant Propak Logistics, Inc. is a corporation organized under the laws of Arkansas, which does business in Kansas and is in good standing to do so.

3. Defendant operates a facility located at 119 Osage Ave, Kansas City, Wyandotte County, Kansas 66105.

4. Plaintiff worked for Defendant at its facility in Kansas City, Wyandotte County, Kansas.

5. Defendant took adverse employment actions against Plaintiff in Kansas City, Wyandotte County, Kansas.

6. This makes jurisdiction and venue proper in this Court.

1

**EXHIBIT A**

7. At all relevant times, Defendant employed more than fifteen people and wasengaged in an industry affecting commerce, specifically, operating warehouses in multiple states.

8. Defendant is therefore an "employer" within the meaning of the Americans with Disabilities Act As Amended, pursuant to 42 U.S.C. § 12111(5).

9. Defendant is a covered "employer" under the Kansas Workers Compensation Act.

## FACTS COMMON TO ALL COUNTS

10. Plaintiff began working for Defendant in early 2021.

11. Plaintiff was assigned to load, store, and unload various pallets and materials at Defendant's Kansas City, Kansas warehouse.

12. Plaintiff routinely operated a forklift to accomplish his assignments with Defendant.

13. On May 21, 2021, Plaintiff was assigned to operate a forklift.

14. As Plaintiff was driving the forklift down an aisle, Plaintiff noticed a stack of pallets falling towards Plaintiff.

15. Plaintiff put up his right arm to shield his face and head from the falling pallets.

16. As a result, Plaintiff's right arm became caught between the outside structure of the forklift and a stack of pallets.

17. The forklift continued moving forward, causing Plaintiff's arm to awkwardly and forcefully torque.

18. This motion caused two bones in Plaintiff's right forearm to violently snap.

19. The ultimate result of this workplace accident was displaced fractures in both the radius and ulna bones of Plaintiff's right forearm.

20. Plaintiff injuries were severe enough to warrant emergency medical attention, which Plaintiff received immediately after the accident.

21. The authorized treating surgeon performed an open reduction, internal fixation of both the broken bones.

22. As a result of the surgery, Plaintiff was unable to use his dominant hand in any meaningful way during his recovery.

23. Plaintiff was kept off work by the authorized treating physician for an extended period—nearly 12 weeks total.

24. For purposes of an employer's workers' compensation insurance premiums, there are two types of claims: an indemnity claim and a medical-only claim.

25. A claim becomes an indemnity claim when an employee cannot be accommodated and misses work.

26. A "medical-only" claim results in a 70% discount in calculating an employer's experience modification rating (EMR).

27. An EMR is used to set premium amounts for an employer's workers' compensation insurance.

28. An employer's EMR increases when the actual losses from workers' compensation claims exceeds the expected losses calculated by the National Council on Compensation Insurance (NCCI).

29. When an EMR increases, it operates to multiply an employer's workers' compensation insurance premiums.

30. The NCCI states that this formula is designed, in part, to discourage frequent and severe claims.

31. Because an EMR is issued by the NCCI, it is an industry-wide standard that cannot be escaped by switching to a new insurer.

32. The severity of Plaintiff's work-related injury prevented Defendant from avoiding the claim from becoming an indemnity claim.

33. Thus, there was no way to further protect Defendant's EMR from being adversely impacted by Plaintiff's claim.

34. In such a situation, an employer can only save money by taking steps to discourage future workers' compensation claims.

35. One way this can be accomplished, albeit illegally, is by making an example of an employee who has exercised workers' compensation rights—by discharging that employee.

36. On August 11, 2021, Plaintiff attended a medical appointment for his work-related injuries.

37. At that appointment, Plaintiff was told that he could return to work the following day.

38. When Plaintiff reported to work on August 12, 2021, he was called into the office at the beginning of his shift.

39. Plaintiff's Lead and the Facility Manager were both present in the office.

40. Plaintiff was told that he was being written up.

41. Having only been a work a matter of a few hours in the preceding 12 weeks—all prior to being injured—Plaintiff asked what transgression the write-up was regarding.

42. Plaintiff was told that he had violated the "three-point safety rule" on May 21, 2021 at the time of his workplace accident.

43. The only three-point safety rule that Plaintiff was then (or is now) aware of is a rule regarding safe climbing.

44. This rule does apply to climbing up and into a forklift.

45. The rule requires that a worker maintain three points of contact with the ladder or object being climbed at all times (two hands and a foot; two feet and a hand).

46. Confused by how this rule applied to Plaintiff's accident, he asked for an explanation.

47. The supervisors refused to elaborate.

48. They simply repeated that Plaintiff have violated the "three-point safety rule."

49. Frustrated, Plaintiff explained the rule as he understood it.

50. Plaintiff then said that, even if that rule for some reason applied, he did not violate it: at the time of the accident, Plaintiff's left hand, both feet, and bottom were in constant contact with the forklift.

51. Again, the supervisors had no response.

52. The supervisors told Plaintiff that he had to sign the write-up.

53. Plaintiff said he would not sign the write-up without an explanation as to what he had done wrong.

5

54. Plaintiff said he was not being told how he violated the rule, and that if it really was the three-point safety rule which Plaintiff was aware, Plaintiff had not violated it.

55. The two supervisors asked Plaintiff to step out of the office.

56. Plaintiff did as instructed, waiting just outside of the closed door.

57. After a short period of time, Plaintiff was called back into the office.

58. A secretary was now present along with the two supervisors.

59. The supervisors presented Plaintiff with handwritten notes on the back of the write-up.

60. These handwritten notes stated that because Plaintiff refused to sign the original write-up, Plaintiff was now being discharged from employment.

61. Plaintiff was again asked to sign the new, handwritten document.

62. Plaintiff agreed to sign the document, as what it described was true: Plaintiff has refused to sign the first write-up.

63. After signing, Plaintiff was instructed to immediately leave the facility.

64. The following day, Plaintiff had an anti-spoliation letter delivered to Defendant's office.

65. The letter demanded that all video footage of Plaintiff's workplace accident be preserved to rebut the allegation that Plaintiff violated any three-point rule.

66. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

6

## COUNT I – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
## (KANSAS WORKER'S COMPENSATION ACT)

67. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 66 of his Petition, as though fully stated herein.

68. Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

69. Defendant took adverse employment actions against Plaintiff, including but not limited to falsely accusing Plaintiff of violating a workplace rule and discharging Plaintiff.

70. Defendant's adverse employment actions taken against Plaintiff were based upon, and directly related to, plaintiff excising his rights for workers' compensation benefits as stated above.

71. Defendant's adverse employment actions against Plaintiff violate State public policy clearly declared by the Courts and the Kansas legislature.

72. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

73. Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

74. Thus, an award of punitive and exemplary damages is appropriate.

WHEREFORE, the Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, and for such other and further consideration and relief as the Court may deem just and equitable.

### COUNT II—DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AS AMENDED

75. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 74 of his Petition, as though fully stated herein.

76. Plaintiff suffered from a physical impairment that limited Plaintiff from life activities, including the ability to maintain employment and the ability to lift.

77. Defendant further regarded Plaintiff's physical ailment as limiting Plaintiff from other life activities and doing so for a longer period of time than the ailment actually would.

78. Additionally, Plaintiff at the time of his discharge had a history of having a physical impairment that substantially limited one or more major life activities—whether misclassified by Defendant or not.

79. In reality, Plaintiff could at all times perform the essential job functions of his position with or without reasonable accommodations.

80. Therefore, the Plaintiff had a "disability" under 42 U.S.C. § 12102(1).

81. Defendant took adverse employment actions against Plaintiff, including but not limited to, falsely accusing Plaintiff of violating a workplace rule and discharging Plaintiff from employment.

82. The motivating factor in these adverse employment actions was Plaintiff's disability, including disability wrongfully attributed to Plaintiff by Defendant.

83. Defendant's conduct was willful and wanton and demonstrates malice.

84. Thus, an award of punitive and exemplary damages is appropriate.

85. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

86. Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

87. On or about December 23, 2021, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant engaged in discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

88. A Notice of Right-to-Sue letter dated March 2, 2022 has been issued and this action is being brought within ninety (90) days from the issuance of such Right-to-Sue letter from EEOC.

89. Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

WHEREFORE, the Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for Plaintiff's costs and expenses incurred herein; for attorneys' fees; and for such other and further consideration and relief as the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury on all accounts and allegations of wrongful conduct alleged in this Petition.

Respectfully submitted,

  */s/ Daniel L. Doyle*
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, KS  66101
(913) 371-1930
(913) 371-0147  Facsimile
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
**ATTORNEYS FOR PLAINTIFF**

10